# No. PD-1039-14

# Court of Criminal Appeals of Texas

**JOSE GUADALUPE RODRIGUEZ ELIZONDO,**
*Appellant*

**v.**

**STATE OF TEXAS,**
*Appellee*

ON APPEAL FROM CAUSE NO. 13-12-00028-CR
IN THE THIRTEENTH COURT OF APPEALS
TRIAL COURT CAUSE NO. CR-3485-10-I
398TH JUDICIAL DISTRICT COURT OF HIDALGO COUNTY, TEXAS
HON. AIDA SALINAS FLORES/HON. LINDA YAÑEZ PRESIDING

**APPELLANT JOSE GUADALUPE RODRIGUEZ ELIZONDO'S
BRIEF ON THE MERITS**

Brandy Wingate Voss
State Bar No. 24037046
SMITH LAW GROUP, P.C.
820 E. Hackberry Ave.
McAllen, Texas 78501
(956) 683-6330 (Telephone)
(956) 225-0406 (Fax)
brandy@appealsplus.com

*Counsel for Appellant Jose Guadalupe Rodriguez Elizondo*

**ORAL ARGUMENT REQUESTED**

# IDENTIFY OF JUDGE, PARTIES, AND COUNSEL

**Trial Court Judges**
Hon. Aida Salinas Flores
Hon. Linda Yañez sitting by assignment

**Appellant**

Jose Guadalupe Rodriguez Elizondo

**Counsel for Appellant**

Brandy Wingate Voss
Smith Law Group, P.C.
820 E. Hackberry Ave.
McAllen, Texas 78501

**Trial Counsel**

Santos Maldonado, Jr.
209 E. University Dr.
Edinburg, Texas 78539

**Appellee**

State of Texas

**Counsel for Appellee**

Lisa C. McMinn
*State Prosecuting Attorney*
Office of State Prosecuting Attorney of
Texas
P. O. Box 13046
Austin, Texas 78711-3046

Ted Hake
Michael Morris
Hidalgo County District Attorney's
Office
Assistant District Attorneys—Appeals
Division
100 N Closner Rm 303
Edinburg, TX 78539

i

**Trial Counsel**

Rolando Cantu
Criselda Rincon-Flores
Hidalgo County District Attorney's Office
Asst. Criminal District Attorneys
100 N. Closner
Edinburg, Texas 78539

# TABLE OF CONTENTS

Identify of Judge, Parties, and Counsel ....................................................................i

Index of Authorities ...................................................................................................vi

Statement of the Case.................................................................................................ix

Statement Regarding Oral Argument .........................................................................x

Issues Presented ..........................................................................................................x

1.  The evidence showed that Elizondo fled nearly 70 yards to his vehicle and got inside—the only realistic place to run under the circumstances—only to be chased by his attackers and forcibly removed from the vehicle. Under those circumstances, did Elizondo sufficiently "abandon the difficulty" to support a self-defense justification, or was his flight a mere change of position of the parties and a continuation of the prior altercation? **[UNBRIEFED ISSUE PER THE COURT'S REQUEST]**

2.  The State alleged that after Elizondo fled the initial altercation and *after* his attackers began their pursuit, Elizondo made statements that provoked a second attack. Was the court of appeals required to conduct a full analysis of the elements of provocation under *Smith v. State*, including (1) whether the defendant did some act or used some words which provoked the attack on him; (2) whether the act or words were reasonably calculated to provoke the attack; and (3) whether the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting some harm on another? Should the Court reverse and render a judgment of acquittal when the words allegedly spoken after a pursuit was already underway could not have possibly provoked a pursuit and a further attack, and where there is no evidence that the defendant intended to provide a pretext for inflicting harm? **[BRIEFED ISSUE PER THE COURT'S REQUEST]**

3. The jury charge contained numerous errors and omissions, which the court of appeals recognized. Yet the court of appeals erroneously (1) held that omissions from the charge were waived by defense counsel, and (2) failed to apply the appropriate harm standard to all the errors presented. Should the Court reverse under these circumstances, where after applying the correct harm analysis, it appears that the charge as a whole was incomplete, the instructions actually provided were woefully inaccurate, and the charge failed to protect and preserve Elizondo's only defense? **[BRIEFED ISSUE PER THE COURT'S REQUEST]**

Statement of Facts ........................................................................... 1

1. Elizondo goes to Punto 3 Nightclub with his family, and the first altercation occurs outside the nightclub. ..................................... 2

   A. The Limon family owns Punto 3 Nightclub. ............................. 2

   B. Two women get into a fight at Punto 3 and are escorted out; Elizondo and his brother Juan follow them outside. ........... 2

   C. Maria tells Elizondo that Junior treated her badly, and the first altercation occurs outside the club. .................................... 5

2. Elizondo runs away from the altercation, attempting to flee, but Punto 3 employees chase him almost seventy yards to his truck. ........ 9

3. A second altercation occurs at Elizondo's truck. ............................... 12

4. Limon threatens Elizondo with deadly force, pointing a gun at him, and Elizondo shoots him. ........................................................... 15

5. Testimony on the reasonableness of Elizondo's conduct ................... 20

6. The trial court submits a provocation instruction over Elizondo's objection and submits a self-defense charge that is inaccurate and incomplete. ................................................................ 24

7. The jury finds Elizondo guilty, and sentences him to twenty-five years in prison. ...................................................................... 27

iv

    8.      The Court of Appeals affirms...............................................27

Summary of the Argument...............................................................32

Argument.......................................................................................34

    I.     The court of appeals should have analyzed all the elements of *Smith v. State*. ..................................................................34

         A.     There was no evidence that Elizondo performed some act or used words that actually provoked the second attack...........36

         B.     There was no evidence that the words "Van a ver" were reasonably calculated to provoke an attack or that the words were used for the purpose and with intent to provide a pretext........................................................40

    II.    The court of appeals affirmed on a jury charge that was grossly incorrect by ignoring and then misapplying this Court's precedent. ..................................................................44

         A.     The court of appeals erroneously affirmed the trial court's submission of a provocation instruction. ......................45

         B.     The court of appeals erroneously refused to review two omissions from the charge, in conflict with this Court's prior decisions. ..................................................................46

         C.     The court of appeals erroneously failed to properly apply the appropriate harm analysis to the other charge errors. .........49

         D.     The jury charge was a garbled mess, and a review of the complete charge and application of the proper harm analyses requires reversal. ......................................52

Conclusion and Prayer ..................................................................56

Certificate of Compliance With Rule 9.4(e)...........................57

Certificate of Service ...................................................................58

# INDEX OF AUTHORITIES

**Cases**

*Almanza v. State*,
686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)..............................45

*Barrera v. State*,
982 S.W.2d 415 (Tex. Crim. App. 1998) ....................................................47

*Bateson v. State*,
46 Tex. Crim. 34, 80 S.W. 88 (1904) .........................................................41

*Brown v. State*,
651 S.W.2d 782 (Tex. Crim. App. 1983). ...................................................54

*Clark v. State*,
No. 04-13-00330-CR, 2014 WL 3843946 (Tex. App.—San
Antonio Aug. 6, 2014, pet. ref'd) (mem. op., not designated for
publication) .................................................................................................41

*Cornet v. State*,
417 S.W.3d 446 (Tex. Crim. App. 2013) .....................................................51

*Elizondo v. State*,
No. 13-12-00028-CR, 2014 WL222834 (Tex. App.—Corpus
Christi Jan. 16, 2014, pet. filed) (mem. op., not designated for
publication) ........................................................................................ passim

*Flores v. State*,
No. 06-05-00023-CR, 2008 WL 41388 (Tex. App.—Texarkana
Jan. 3, 2008, pet. ref'd) (mem. op., not designated for publication) .............46

*Frank v. State*,
688 S.W.2d 863 (Tex. Crim. App. 1985) ............................................ 44, 47

*Guerra v. State,*
No. 13-99-036-CR, 2000 WL 34251905 (Tex. App.—Corpus
Christi Aug. 17, 2000, no pet.) (not designated for publication) ..................41

*Lerma v. State,*
807 S.W.2d 599 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) ................................................................................................47

*Malone v. State*,
No. 06-11-00013-CR, 2011 WL 5221264 (Tex. App.—Texarkana Nov. 3, 2011, no pet.) (mem. op., not designated for publication) ...............41

*Mendoza v. State*,
349 S.W.3d 273 (Tex. App.—Dallas 2011, pet. ref'd) ......................... passim

*Morrison v. State*,
158 Tex. Crim. 424, 256 S.W.2d 410 (1953) .................................................41

*Osborne v. State*,
No. 02-11-00010-CR, 2011 WL 5903651 (Tex. App.—Fort Worth Nov. 23, 2011, no pet.) (mem. op., not designated for publication) .............41

*Posey v. State*,
966 S.W.2d 57 (Tex. Crim. App. 1998) .......................................................31

*Reeves v. State*,
No. 01-10-00395-CR, 2012 WL 5544770 (Tex. App.—Houston [1st Dist.] Nov. 15, 2012) (mem. op., not designated for publication), *aff'd*, 420 S.W.3d 812 (Tex. Crim. App. 2013) .......... 38, 44, 52

*Reynolds v. State,*
371 S.W.3d 511 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ................46

*Saxton v. State*,
804 S.W.2d 910 (Tex. Crim. App. 1991) .....................................................50

*Smith v. State*,
965 S.W.2d 509, 512 (Tex. Crim. App. 1998) ...................................... passim

*Trevino v. State,*
83 Tex. Crim. 562, 204 S.W.2d 996 (1918) (op. on reh'g) .........................37

*Vega v. State,*
394 S.W.3d 514 (Tex. Crim. App. 2013) .....................................................48

*Villarreal v. State*,
    No. PD-0332-13, 2015 WL 458146 (Tex. Crim. App. Feb. 4,
    2015) ..................................................................................................54

**Statutes**

TEX. PENAL CODE ANN. § 9.04 ...........................................................46

TEX. PENAL CODE ANN. § 9.32(b)(1)(A)-(B)................................. 25, 49

**Other Authorities**

Tex. Pattern Jury Charges, *Criminal Defenses,* § B14.2.9 (2013) .........................53

**Rules**

TEX. R. APP. P. 78.1(c) ......................................................................44

TEX. R. APP. P. 78.1(d)......................................................................44

TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:

Appellant, Jose Guadalupe Rodriguez Elizondo, files his Brief on the Merits as requested by the Honorable Court and respectfully shows:

## STATEMENT OF THE CASE[1]

*Nature of the Case:*

The State charged Elizondo with the murder of Fermin Limon, Sr.[2] Elizondo was tried by a jury and elected to have the jury determine punishment.[3]

*Course of Proceedings:*

Trial before a jury lasted for nine days, and the jury heard evidence regarding the alleged murder and extensive testimony on Elizondo's self-defense justification.[4] At the conclusion of the guilt-innocence phase of trial, the jury found Elizondo guilty of murder.[5] The jury assessed punishment of twenty-five years.[6]

*Trial Court's Disposition:*

The trial court assessed punishment in accordance with the jury's verdict and sentenced Elizondo to twenty-five years' imprisonment, and imposed court costs.[7]

---

[1]   The clerk's record consists of one volume and two supplemental volumes, which will be cited as "CR[page]" and "[volume]Supp.CR[page]," respectively. The reporter's record consists of twenty-one volumes and one supplemental volume, which will be cited as "[vol.]RR[page]" and "Supp.RR[page]," respectively. The exhibit volumes will be cited as follows: "[vol]RRSX[exhibit number]" for the State's exhibits, and "[vol]RRDX[exhibit number]" for the Defense's exhibits.

[2]   CR2.

[3]   CR62.

[4]   10 RR-18 RR.

[5]   2 Supp.CR9.

[6]   2 Supp.CR14.

[7]   CR69-71.

| | |
|---|---|
| *Motion for Rehearing and Reconsideration En Banc:* | Elizondo timely filed motions for rehearing and for reconsideration en banc on March 3, 2014 (the Thirteenth Court granted an extension of time). |
| *Court of Appeals' Disposition and Appeal to This Honorable Court:* | The Thirteenth Court of Appeals overruled Elizondo's motions for rehearing and for reconsideration en banc on June 30, 2014. Elizondo filed a petition for discretionary review, which this Court granted. The Court requested briefing on the merits as to issues 2 and 3 only. |

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would be beneficial in this case because it presents unique circumstances that should be addressed by this Court. Specifically, this case presents complicated issues of self-defense, provocation, and abandonment of the difficulty, and a grossly erroneous jury charge on those defensive issues. Counsel for appellant can assist the Court through oral argument.

## ISSUES PRESENTED

1. The evidence showed that Elizondo fled nearly 70 yards to his vehicle and got inside—the only realistic place to run under the circumstances—only to be chased by his attackers and forcibly removed from the vehicle. Under those circumstances, did Elizondo sufficiently "abandon the difficulty" to support a self-defense justification, or was his flight a mere change of position of the parties and a continuation of the prior altercation? **[UNBRIEFED ISSUE PER THE COURT'S REQUEST]**

2. The State alleged that after Elizondo fled the initial altercation and *after* his attackers began their pursuit, Elizondo made statements that provoked a second attack. Was the court of appeals required to conduct a full analysis of

the elements of provocation under *Smith v. State*, including (1) whether the defendant did some act or used some words which provoked the attack on him; (2) whether the act or words were reasonably calculated to provoke the attack; and (3) whether the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting some harm on another? Should the Court reverse and render a judgment of acquittal when the words allegedly spoken after a pursuit was already underway could not have possibly provoked a pursuit and a further attack, and where there is no evidence that the defendant intended to provide a pretext for inflicting harm? **[BRIEFED ISSUE PER THE COURT'S REQUEST]**

3.    The jury charge contained numerous errors and omissions, which the court of appeals recognized. Yet the court of appeals erroneously (1) held that omissions from the charge were waived by defense counsel, and (2) failed to apply the appropriate harm standard to all the errors presented. Should the Court reverse under these circumstances, where after applying the correct harm analysis, it appears that the charge as a whole was incomplete, the instructions actually provided were woefully inaccurate, and the charge failed to protect and preserve Elizondo's only defense? **[BRIEFED ISSUE PER THE COURT'S REQUEST]**

# STATEMENT OF FACTS

Fermin Limon, Sr. ("Limon") was the owner of Punto 3 Nightclub. In the early morning hours of August 9, 2010, Jose Guadalupe Rodriguez Elizondo, who was an off-duty U.S. Customs and Border Protection Agent, was involved in two separate altercations outside Punto 3 nightclub. The details of those altercations were disputed at trial.

It is undisputed, however, that after Elizondo fled from the first altercation, several Punto 3 employees pursued him almost 70 yards to his vehicle. There, a second altercation occurred while one of those employees either forcefully entered or removed Elizondo from his vehicle, or at the very least, was attempting to do so. It is likewise undisputed that Limon followed thereafter and pointed a gun at Elizondo. After Elizondo repeatedly asked Limon to put the gun down and Limon failed to comply, Elizondo shot Limon in self-defense. The various accounts from the witnesses are described below:

1

**1.    Elizondo goes to Punto 3 Nightclub with his family, and the first altercation occurs outside the nightclub.**

**A.    The Limon family owns Punto 3 Nightclub.**

Limon owned a nightclub called Punto 3.[8] Limon employed his daughter Mireya and son Junior at the club.[9] Limon also employed Rodrigo Carreon Hernandez, Francisco Garcia, and Bryan Cruz at Punto 3.[10] In August 2010, the nightclub did not have professional security guards; instead, Punto 3 relied on its employees if an incident occurred requiring security.[11]

**B.    Two women get into a fight at Punto 3 and are escorted out; Elizondo and his brother Juan follow them outside.**

Elizondo, his wife Maria, and his brother Juan went to Elizondo's mother's house on the afternoon of August 8, 2010 for a barbeque.[12] The three then went to Punto 3 Nightclub, arriving at approximately 12:45 a.m. on August 9, 2010.[13]

At the time of the events in this case, Elizondo was employed by the Department of Homeland Security as a United States Customs and Border

---

[8]    Punto 3 Nightclub is located in Mission, Texas on Elida Street, which runs east and west, and the nightclub is situated on the south side of that roadway. 11RR21; 20RRSX111. As shown on State's Exhibit 111, a fence runs along the east side of Punto 3, running north and south, separating the parking area. 20RRSX111. The fence is approximately six feet tall. 11RR130.

[9]    12RR6-7, 9; 15RR208-09. Fermin Limon, Jr. will be referred to as "Junior" to distinguish him from his father.

[10]    12RR36; 13RR35, 96; 14RR83.

[11]    12RR19-20; 16RR15-17.

[12]    14RR197, 207; 15RR105; 16RR111; 21RRDX21.

[13]    14RR207-09; 15RR108-110

Protection Officer.[14] He testified that he was authorized to carry his government-issued firearm at all times, concealed or otherwise.[15] Elizondo testified that, nevertheless, he left the firearm and his officer credentials inside the center console of his Dodge truck, which he parked in the parking lot of Punto 3.[16]

Elizondo's brother Juan testified that once inside the club, he attempted to break up a fight between two women.[17] Punto 3 employees outside escorted Juan with the group, and Elizondo followed, telling Juan not to get involved and to calm down.[18] Juan stated that he went outside and began talking to Limon, who he understood to be the manager or head of security at Punto 3.[19] Juan explained the situation to Limon and was allowed to go back inside the club.[20] Juan testified that at the time, there were at least five Punto 3 employees outside the club.[21]

Elizondo's wife, Maria, testified that after she, Juan, and Elizondo arrived at Punto 3, she saw some people fighting and that Juan was nearby.[22] She told Elizondo to check on Juan.[23] The people were exiting the club, and some were

---

[14] 14RR241; 15RR205; 16RR111, 171-72; 21RRDX21. Prior to becoming a customs agent, Elizondo served as a peace officer for the City of Donna. 16RR172.
[15] 16RR179-83; 21RRDX24.
[16] 16RR114, 175-76; 21RRDX21.
[17] 14RR221-22.
[18] 14RR221-226; 12RR173; 16 RR 112; 21RRDX21.
[19] 14RR226-27.
[20] 14RR228-29.
[21] 14RR230.
[22] 15RR114.
[23] 15RR114-15.

3

throwing bottles, so she walked toward the entrance.[24] Maria testified that she had a drink in her hand, and a female employee of the club said, "This stupid lady doesn't want to leave her drink behind."[25] Maria then brought her drink to the counter and turned toward the entrance.[26] She testified that she tried to follow Elizondo and Juan out of the club, and a Punto 3 employee grabbed her and said, "I know the woman of your kind and get out."[27] She testified that he pushed her and she got upset.[28]

Junior testified that he recalled six people involved in a "discussion," and his mother told him to go "handle the situation."[29] Junior escorted some of the people outside.[30] Junior's wife, who worked the nightclub's ticket booth, told Junior that a woman, later identified as Maria, was attempting to leave with a drink.[31] Junior claimed that he told Maria to leave her drink inside, but he denied that he or his wife used any bad language.[32] Junior admitted, however, that he grabbed Maria by

---

[24]   15RR115.
[25]   15RR116.
[26]   15RR118-120.
[27]   15RR120-22; *see also* 15RR182.
[28]   15RR121-22; *see also* 15RR182.
[29]   15RR213-14.
[30]   15RR215, 218.
[31]   15RR218-20.
[32]   15RR220-21.

the arm.[33] Junior then returned to the bar, and his mother asked him to check on Limon outside.[34]

### C. Maria tells Elizondo that Junior treated her badly, and the first altercation occurs outside the club.

Maria testified that as Juan went back inside the club, she noticed Junior making fun of her.[35] She told Elizondo that Junior had pushed her.[36] It was undisputed that Elizondo confronted Junior about pushing his wife, but the precise sequence of events was disputed.

Rodrigo, who worked at Punto 3, testified that Elizondo was outside the club talking to Limon, and Maria was being disrespectful and cussing at the Punto 3 employees.[37] Then Junior "disrespected her," and Elizondo intervened.[38] Rodrigo claimed that Elizondo said, "Well son of a bitch, are you going to calm down or not"?[39] According to Rodrigo, Elizondo said, "Don't disrespect my woman you son of a bitch," and then hit Limon.[40] Rodrigo testified that he then came forward and hit Elizondo with an open palm.[41] Rodrigo claimed that Elizondo kicked him,

---

[33]    15RR224-25.
[34]    15RR226.
[35]    15RR122, 125-26.
[36]    15RR126; 16 RR113; 21RRDX21.
[37]    14RR95-97.
[38]    14RR97-98, 125.
[39]    14RR98.
[40]    14RR98-99.
[41]    14RR99-100.

5

and a woman grabbed him from behind.[42] Then Elizondo ran toward the parking lot, and Bryan followed him, with Rodrigo following behind Bryan.[43]

Junior testified that when he went outside the club, he saw his father talking to two other men, using raised voices.[44] Bryan, Rodrigo, and another Punto 3 employee called "Pajaro" were standing with Limon.[45] Junior claimed that when he walked outside, Maria was screaming at him and calling him names, and he got upset.[46] Junior testified that Elizondo then intervened and called him a "dumb ass."[47] Junior said Limon scolded Elizondo for calling Junior a name, and that Elizondo then tried to hit Limon, but Elizondo missed.[48] He testified that Rodrigo reacted and hit Elizondo with the back of his hand.[49] Junior agreed that after Rodrigo hit him, Elizondo ran away.[50]

In contrast, Maria testified that once outside Punto 3, she told Elizondo that Junior was "handling her."[51] She stated that when Elizondo walked toward Junior and asked, "Why were you pushing my wife?," Junior reacted angrily and became

---

[42]     14RR100.
[43]     14RR101-02, 126.
[44]     15RR226-27.
[45]     15RR231.
[46]     15RR228.
[47]     15RR228-29.
[48]     15RR229-30; 16RR21-22.
[49]     15RR232; 16RR60-61, 73-74. Junior's prior statement, given to police right after the incident, claimed that Elizondo tried to hit him, not his father. 16RR57. He told the police that because he moved out of the way, Elizondo hit Rodrigo instead. 16RR57.
[50]     15RR233; 16RR23-24.
[51]     15RR126.

aggressive.[52] Then another Punto 3 employee said, "You're not going to hit my brother," and he punched Elizondo.[53] She explained that Elizondo "started moving back until he got loose and he ran."[54] Maria started yelling for the men to stop.[55]

Juan testified that after he re-entered the club, he did not see what was going on outside, but he noticed someone running outside and realized Elizondo had not come back inside Punto 3.[56] He went back towards the club's entrance, and as he approached the door, he heard Maria yelling.[57] He walked outside and saw Maria crying.[58] Maria told Juan that Elizondo had "got punched or he got beat up or something like that," and then Juan saw Elizondo running away.[59]

In Elizondo's statement to police, he stated that outside the club, Maria pointed out a bald man that had pushed her.[60] According to Elizondo, the man came toward Elizondo aggressively and pushed him, and Elizondo pushed back.[61] Then, several people started punching Elizondo.[62]

---

[52] 15RR127-28.
[53] 15RR127-32.
[54] 15RR129.
[55] 15RR132.
[56] 14RR230-32.
[57] 14RR234.
[58] 14RR234.
[59] 14RR235.
[60] 16RR113; 21RRDX21.
[61] 16RR113; 21RRDX21.
[62] 16RR113; 21RRDX21.

7

At trial, Elizondo testified to essentially the same sequence of events.[63] He claimed that when he first saw Maria, she looked as if she were about to cry.[64] Maria pointed at Junior and told Elizondo that Junior had pushed her.[65] Junior did not have a Punto 3 logo on his shirt, and Elizondo thought he was just a customer.[66]

Elizondo asked Junior why he had pushed Maria, and he conceded that he had called Junior a bad name.[67] Junior responded, "Here I can do whatever I want."[68] Elizondo claimed that Junior then charged to the front and pushed him.[69] Elizondo pushed him back.[70] Then, Rodrigo hit Elizondo on the side of the face.[71]

At that point, Elizondo said it "clicked" in his mind that all these men were together, and Elizondo tried to hit Rodrigo back.[72] He explained that it was chaotic, and there were about four men swinging and grabbing at him.[73] Elizondo knew he was outnumbered, and he was moving backwards trying to get away from them.[74]

---

[63]     16RR183-95.
[64]     16RR183.
[65]     16RR185.
[66]     16RR186-87.
[67]     16RR185-86, 263-64.
[68]     16RR186.
[69]     16RR186-87.
[70]     16RR188.
[71]     16RR188.
[72]     16RR190.
[73]     16RR191.
[74]     16RR192.

8

He could not defend himself against all four of them—there were too many of them.[75]

Elizondo explained that he thought he needed to get out of there.[76] The only safe place he could think of to go was to his truck.[77] So he turned and ran as fast as he could to his truck.[78] Elizondo testified that he did not think about getting his gun and returning at that point; he just wanted to get away from the brawl.[79] As he turned to run away, he could feel the men hitting him and kicking his feet to try to trip him.[80]

## 2. Elizondo runs away from the altercation, attempting to flee, but Punto 3 employees chase him almost seventy yards to his truck.

It was undisputed that, after the first altercation outside the front door of Punto 3, Elizondo ran through the parking lot and around the fence to his vehicle, and Bryan, Rodrigo, and Junior followed him.[81] The group chased Elizondo the entire distance from the front door of Punto 3 around the fence to the parking lot, which was approximately 67 yards.[82]

---

[75] 16RR192.
[76] 16RR194.
[77] 16RR195.
[78] 16RR195.
[79] 16RR196.
[80] 16RR196.
[81] 12RR178, 180; 13RR15, 26, 66; 14RR126, 235; 15RR133-34, 233; 16RR113, 197; 21RRDX21.
[82] 11RR95; 14RR102-03, 235.

Rodrigo admitted that during the chase, he was yelling at Elizondo to "stop asshole."[83] According to Rodrigo, Elizondo unlocked his truck with his keys as he was running toward the vehicle, and when he arrived at the truck, Elizondo got inside, closed the door, and locked the vehicle.[84]

Junior likewise admitted chasing Elizondo to his truck.[85] Junior stated he could not recall whether Bryan or Rodrigo were yelling at Elizondo to "stop, asshole," or saying anything else.[86] He claimed, however, that while he was chasing Elizondo, he heard Elizondo say, "Van a ver," in Spanish, which was translated as, "You're going to see."[87]

Junior claimed that he took that as a threat, and he got scared.[88] Junior stated that upon hearing those words, he continued following, but slowed his pace.[89] He then claimed that "at that point," he was following Elizondo because of "what he had heard," not because of what Elizondo had done to his father, Limon.[90]

Later in his testimony, Junior changed his story: He claimed that occasionally the Punto 3 employees would follow customers to their cars to make

---

[83]    14RR102, 126.
[84]    14RR103.
[85]    15RR233.
[86]    16RR24-25.
[87]    15RR234-35; 16RR30.
[88]    15RR235.
[89]    15RR235.
[90]    15RR235.

sure they would "leave safely" and "don't get in a fight outside the club."[91] He testified that he would confirm that customers would go to their cars because he feared that "[t]hey would go grab a weapon or try to grab—go grab something out of their car or something and take it out on the people that are inside the club or outside when we're taking them outside . . . ."[92]

Juan likewise testified that he saw Elizondo run towards the parking lot and turn around the fence.[93] A security guard following Elizondo took a swing to hit him, but missed Elizondo.[94] Juan then ran after Elizondo, noticing that the security guards were going after Elizondo.[95] He testified that he heard them yelling at Elizondo along the way.[96]

Maria testified that the men were running behind Elizondo, and they caught him before he got to the fence, hitting him and hitting his feet from behind.[97] She stated that the men were yelling, "Stop asshole. Stop."[98] Maria followed after.[99]

Elizondo likewise testified at trial that as the men were following him to his truck, one of the men was yelling, "Stop dumb ass" or "stop asshole."[100] Based on

---

[91]     16RR9-10.
[92]     16RR10, 25.
[93]     14RR235.
[94]     14RR235.
[95]     14RR235.
[96]     15RR11.
[97]     15RR133-36.
[98]     15RR133.
[99]     15RR136-37.
[100]    16RR198.

11

what the men were saying and their tone of voice, and that they were shouting all the way to his truck, Elizondo did not believe that these men were going to let him go once he got to the truck.[101]

### 3.     A second altercation occurs at Elizondo's truck.

All the witnesses present at the time of the shooting said that Elizondo ran to his truck and got inside, and Bryan, Rodrigo, and Junior approached the truck's window.[102] Francisco, a Punto 3 employee, testified that Bryan, Rodrigo, and Junior were "banging on the windows" of the truck.[103] Francisco then heard Bryan say, "Run. There's a gun."[104]

Rodrigo likewise testified that Junior "got to the truck and was hitting the window telling [Elizondo], 'Get off asshole.'"[105] Rodrigo agreed that Junior was trying to get Elizondo to come out of his truck because Elizondo was already inside with the door locked.[106] Rodrigo claimed that "another individual," who he did not identify, came up behind and grabbed Junior.[107]

---

[101]     16RR198.
[102]     13RR128, 139; 14RR103-04; 15RR236. Investigator Max Cantu, who took Elizondo's statement the morning after the shooting, testified that his understanding of Elizondo's statement was that he merely reached into the vehicle, but did not actually get inside the vehicle. 16RR120. Investigator Cantu, however, explained this was how he "interpreted" Elizondo's statement. 16RR120.
[103]     13RR149, 179.
[104]     13RR129, 150.
[105]     14RR104, 105; 15RR42.
[106]     15RR80.
[107]     14RR105.

12

Rodrigo testified that Elizondo got out of the truck and hit Junior on the forehead.[108] Rodrigo claimed that he then jumped into the fight again, and he heard the gun go off, but the bullet missed him because Junior hit Elizondo in the stomach with his head.[109] Rodrigo stated that he ran away from the gunfire.[110] Later in his testimony, Rodrigo admitted that Elizondo never pointed the gun at him and fired it.[111] He claimed that Elizondo tried to hit him with the gun, and it went off.[112]

Junior denied hearing Bryan or Rodrigo say there was a gun, and he claimed that when he arrived at the truck, he approached it by himself.[113] He did not see Rodrigo or Bryan when he got to the truck.[114] Junior stated that Elizondo was inside the truck when he arrived there.[115] He stated that he "tapped" on the driver's side window, so that Elizondo "could come outside of his truck."[116] Later, he admitted he was not "tapping nicely."[117]

---

[108]   14RR106; *see also* 13RR130, 150.
[109]   14RR107.
[110]   14RR108.
[111]   15RR49, 52-53.
[112]   15RR50.
[113]   15RR236.
[114]   16RR27.
[115]   15RR237; 16RR28.
[116]   15RR237.
[117]   16RR29.

Junior testified that Juan then grabbed him from behind.[118] He claimed he felt punches on his head, but he could not tell from whom they were coming.[119] He also could not tell if a gun was being used to hit him, but stated that he had a cut on his head that bled a lot, that he had bruising on his head an back, and that his shirt was pulled open.[120] He stated that he ducked down, and then he heard a shot.[121]

In contrast, Juan testified that as he approached Elizondo's truck, a man was there and appeared to be struggling with Elizondo, and Juan also engaged in a struggle with the man.[122] At that point, Elizondo was already outside of his truck.[123] Juan hit the man, and the man hit him back.[124]

Elizondo told the police "they were coming after him, he pulled—he went to his vehicle, he got his gun, he grabbed it . . . ."[125] At trial, Elizondo testified that while he was running to the vehicle, he remembered his gun.[126] He said he unlocked the door as he was running toward it.[127] He got in as fast as he could and

---

[118]  15RR238; 16RR62.
[119]  15RR238-39. While both Rodrigo and Junior testified that Junior's head was cut, no injuries were documented by the police or at the hospital, and Junior did not have a scar. 15RR47; 16RR63-65.
[120]  16RR7-8, 67-68.
[121]  15RR239.
[122]  14RR241, 243.
[123]  14RR242-43.
[124]   14RR243.
[125]  12RR181.
[126]  16RR199.
[127]  16RR199.

shut the door.[128] He said he did not have time to lock the door, and he immediately opened the console to grab his gun.[129]

Elizondo explained that he intended to grab the gun and his credentials, and he thought that if he displayed his credentials, the men might stop.[130] Elizondo grabbed the gun and was about to grab his credentials, and someone opened the door and pulled him out of the truck.[131] Elizondo said that he knew the rest of the men were still coming, and so when the man pulled him out of the truck, he hit him with the gun.[132] Elizondo testified that Juan then arrived and grabbed the man from behind.[133] When Juan grabbed the man, something grabbed Elizondo's attention toward the rear of the truck, and that is when Elizondo noticed Limon standing there with a gun pointed toward him.[134]

### 4. Limon threatens Elizondo with deadly force, pointing a gun at him, and Elizondo shoots him.

Francisco Garcia claimed after Elizondo got out of his truck, he heard a gunshot, and moments afterward he saw Limon walking along the fence line toward the gunshot.[135] Francisco then saw "two guns being pulled out," and he

---

[128]    16RR199.
[129]    16RR199-200.
[130]    16RR200-01.
[131]    16RR201-03.
[132]    16RR203.
[133]    16RR204.
[134]    16RR204-06, 208.
[135]    13RR133.

15

explained that the guns were pointed at the same time.[136] He claimed that Elizondo and Limon were pointing the guns at each other, and he heard Elizondo tell Limon several times to drop down to the floor.[137] Francisco testified that Limon did not follow the orders, but he was making hand gestures and pointing his gun with his other hand.[138] Francisco thought the hand gesture meant to "calm down or something."[139] Then Elizondo shot Limon.[140] Limon walked back towards the club and fell down, and then Rodrigo and Bryan took his gun and started shooting towards Elizondo.[141]

Rodrigo confirmed that at this point, he also saw Limon approaching with a gun, pointing it at Elizondo.[142] When Rodrigo first saw Limon, he already had the gun in his hand.[143] He claimed that Limon saw that "they had his son," and that Elizondo had his back to him.[144] Rodrigo stated that at that time, Elizondo was hitting Junior with his gun.[145]

---

[136]    13RR134, 174. It was undisputed that Limon had a 9-millimeter Taurus handgun, that he would carry it while at Punto 3, and that he had it that night. 11RR87; 12RR22-24, 96, 104, 125; 12RR181; 14RR101-02; 20RRSX113; 21RRDX16.
[137]    13RR135, 171, 172-73.
[138]    13RR135.
[139]    13RR136.
[140]    13RR137.
[141]    13RR139-142, 175.
[142]    14RR108.
[143]    15RR44.
[144]    14RR108.
[145]    15RR47.

Rodrigo claimed that Limon told Elizondo to "calm down. Let's settle this problem," but acknowledged that Limon was pointing the gun at Elizondo.[146] He stated that Elizondo told Limon to "[g]et to the ground son of a bitch. Get to the ground . . . [y]ou dog."[147] Later, Rodrigo inconsistently claimed that Elizondo said, "Hit the ground you motherfucker. Hit the ground. . . You dog."[148]

Rodrigo testified that Elizondo did not give Limon time to comply, and "instantly he shot him."[149] Later, however, Rodrigo admitted that it "took a little while."[150] Rodrigo testified that Limon walked away and fell down by the fence, and Rodrigo then grabbed Limon's gun and attempted to shoot at Elizondo.[151] The gun locked up, and so Rodrigo passed it to Bryan, who unlocked it and fired at Elizondo.[152] Later, Rodrigo took Limon's weapon and hid it.[153] Rodrigo was later arrested for tampering with evidence.[154]

Junior stated that before he heard the first shot, he heard Juan yell that Elizondo was an officer.[155] Junior was turned loose, and he ran back to the club.[156]

---

[146]    14RR108.
[147]    14RR109.
[148]    15RR46.
[149]    14RR110.
[150]    15RR46.
[151]    14RR111.
[152]    14RR112-15.
[153]    14RR121-24.
[154]    It was undisputed that, after the incident, Bryan Cruz, Rodrigo Carreon Hernandez, and Adelfina Herrera Carredon were arrested for tampering with evidence. 12RR122-24, 126; 15RR174-77. Specifically, these individuals concealed Limon's weapon after the incident, and it was recovered in a dumpster by the police. 12RR122-24, 126; 13RR49; 14RR37.
[155]    16RR38.

Junior testified at trial that he never saw Limon approach the truck.[157] He claimed that as he ran back to the club, he saw Limon on the ground.[158] Later, however, he conceded that immediately after the shooting, he told the police that he saw his father pull out a gun.[159] But he again denied actually seeing it.[160]

Juan testified that he was struggling with the person at the truck, and he never saw Limon approach with his gun.[161] But he heard his brother say, "U.S. Customs. Please put the gun down."[162] Juan asserted that Elizondo asked twice for Limon to put the gun down.[163] Juan testified that he feared for his life and tried to hide himself, and then he heard some shots.[164] He explained that he heard Elizondo fire two shots, but he did not know whom Elizondo was shooting at.[165] Then shots were fired back at Juan and Elizondo.[166]

Maria testified that when she got to Elizondo's truck, he was already standing outside by the door.[167] She said there were several security guards at the truck.[168] She testified that one of the men had a pistol and was pointing it at

[156]     15RR240.
[157]     15RR240; 16RR38.
[158]     15RR242.
[159]     16RR41.
[160]     16RR42-44.
[161]     15RR16.
[162]     14RR250; 15RR15-17.
[163]     15RR17.
[164]     14RR251; 15RR18.
[165]     14RR249-50.
[166]     14RR252.
[167]     15RR137.
[168]     15RR137-38.

Elizondo.[169] She stated that she was very scared.[170] She believed the man wanted to fire the gun.[171] She testified that if the person had shot the gun, the bullet would have hit her and also Elizondo.[172] Maria explained that Elizondo told the man to "[l]ower your weapon."[173] She then heard Elizondo shoot his gun.[174]

Elizondo told Trooper Champion that he warned the Punto 3 employees he was U.S. Customs and told them to get back.[175] They refused to comply and continued to come after him.[176] He saw Limon reach behind his back and observed what he thought was a gun.[177]

According to Trooper Champion, right after the shooting, Elizondo told him that he went to his vehicle and got his gun, and thereafter he stated that he was "U.S. Customs and Border Protection and that he pointed the gun."[178] He said that "when he pointed the gun he saw the victim reach behind his back, I believe is what he said; he pulled out what he believed was a gun and he shot him; and then

---

169     15RR138, 152.
170     15 RR152.
171     15RR152.
172     15RR153.
173     15 RR140. Maria testified that the other man with the gun shot at her and Elizondo, and she felt dirt flying on her feet. 15 RR141, 154.
174     15 RR143.
175     13RR16.
176     13RR16.
177     13RR16, 68.
178     12RR180.

he told me—I believe he said three times or I believe he said he shot three times at the subject."[179]

At trial, Elizondo testified that he told Limon two times that he was "U.S. Customs" and to "throw the gun."[180] But Limon did not lower his weapon.[181] Elizondo then shot twice.[182] Elizondo explained that he fired once, but he did not see any reaction from Limon.[183] Elizondo thought he missed, so he shot a second time.[184]

## 5.    Testimony on the reasonableness of Elizondo's conduct.

Ricardo Balli, Jr. testified that he was a former police officer and was then an agent for the Texas Alcoholic Beverage Commission.[185] Agent Balli testified that, if a law enforcement officer went to a bar, he was legally entitled to take his government-issued weapon and either carry it on him or leave it in his vehicle.[186] He agreed it would still be legal to carry the weapon if the officer was off duty and had a few drinks, as long as the officer did not become intoxicated.[187]

In Elizondo's statement to police, he explained that he became scared outside the club because the security guards were "not trying to push me away like

---

[179]    12RR181.
[180]    16RR206.
[181]    16RR206.
[182]    16RR214.
[183]    16RR214-15.
[184]    16RR215.
[185]    17RR40.
[186]    17RR45-47.
[187]    17RR47-48.

20

security guards would do. The men were attacking me, and I just thought I need to get away from them before they take me to the ground."[188] So he ran to his truck.[189] Elizondo was aware that the men were chasing him, and he could feel them punching at him and kicking at his feet and could hear them yelling at him.[190]

Elizondo told the police that he was scared for his life, and he tried to run away, but the Punto 3 employees were continuing to assault him and followed him to his truck.[191] Trooper Champion testified that Elizondo told him that he was in fear of his life because he was being attacked.[192] Elizondo testified at trial that at the point he was being chased, it was a deadly situation for him because he "had four guys chasing me. We know four guys can kill you if they kick you enough or punch you enough."[193] He explained, "My previous experience as a police officer and from your own cases where two, three people can beat you up—can beat you down to death. Yes. So I felt the need to grab the weapon, yes."[194]

On the way to his truck, Elizondo unlocked the door.[195] He got inside, grabbed his gun, and then he felt someone grab him and pull him out of the truck.[196] He came out of the truck swinging and hit the man.[197]

---

[188]    16RR113; 21RRDX21.
[189]    16RR113; 21RRDX21.
[190]    16RR113; 21RRDX21.
[191]    12RR180; 13RR15, 66, 68.
[192]    12RR178, 180.
[193]    17RR19.
[194]    17RR21.
[195]    16RR114; 21RRDX21.

At that point, Juan grabbed the man, and Elizondo then saw Limon pointing the gun at him.[198] Elizondo told police that he was scared that if Limon had a gun, the other men had guns as well.[199] He warned Limon that he was a "United States Customs Agent" and told him to put the gun down twice.[200] Elizondo thought Limon was going to shoot him, particularly because Limon had "chased him all the way to the parking lot away from the business," Elizondo had "already been assaulted at the front of the club," and Elizondo had been pulled out of his truck.[201] Elizondo testified he felt that he had no other choice but to shoot Limon, because Limon was going to shot him.[202]

Investigator Max Cantu testified that if someone is pointing a loaded gun at another person, it means that the person is willing to kill.[203] He testified that if someone pointed a gun at him, he would be in fear of his life, and if he asked the person to put the gun down but the person refused, it would concern him.[204]

At first, Investigator Cantu opined that Limon had a right to protect his patrons, his business, and himself.[205] He agreed, however, that Limon had followed

---

[196]    16RR114; 21RRDX21.
[197]    16RR114; 21RRDX21.
[198]    16RR114; 21RRDX21.
[199]    16RR114; 21RRDX21.
[200]    16RR114; 21RRDX21.
[201]    16RR207.
[202]    16RR209.
[203]    16RR129.
[204]    16RR129.
[205]    16RR135.

22

Elizondo to his truck, at a distance of over 60 yards.[206] With respect to his business, once presented with the Texas Penal Code provisions regarding deadly force to protect property, Investigator Cantu agreed they did not apply.[207] Investigator Cantu then backtracked and clarified that he only meant that Limon had the right to carry the weapon at his business, not to use deadly force that night.[208] Investigator Cantu testified that if a customer pulled out a gun at a business, the business owner could protect his customers.[209] He further testified that if someone was hitting his son with a blunt object, he would protect that person.[210]

Investigator Cantu explained that peace officers are trained that when firing a pistol at someone, they aim for "center mass."[211] In other words, if a person is pointing a weapon at a peace officer, the officer is not trained to shoot them in the leg to wound the person.[212] And he agreed there was nothing in the law that requires a person to try to merely wound another person if using deadly force in

---

[206]    16RR136.
[207]    16RR142-43.
[208]    16RR143.
[209]    16RR151.
[210]    16RR151.
[211]    16RR153.
[212]    16RR153-54.

self-defense.[213] Elizondo likewise testified that he was trained to shoot through the abdominal and chest area, or "center mass."[214]

Trooper Champion testified that when he first approached Elizondo, he saw Elizondo as a threat, even though Elizondo did not have his gun pointed at him, and so Trooper Champion pointed his pistol at Elizondo.[215] And, he agreed that threat would be a "lot more serious" if Elizondo had "lifted that gun and pointed it" at him.[216] In other words, pointing a gun at someone is a serious threat.

## 6. The trial court submits a provocation instruction over Elizondo's objection and submits a self-defense charge that is inaccurate and incomplete.

Initially, the jury charge instructed the jury on the presumption of reasonableness, as follows:

> The actor's belief that the deadly force was immediately necessary is presumed to be reasonable if the actor:
>
> (1) knew or had reason to believe that the person against [sic] deadly force was used was committing or attempting to commit murder; and
> (2) did not provoke the person against whom the force was used, and
> (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of law or ordinance regulating traffic at the time the force was used.[217]

---

[213] 16RR154.
[214] 16 RR213-14.
[215] 12RR200.
[216] 12RR199-200.
[217] 2Supp.CR3.

Elizondo's trial counsel did not object to this language in that it fails to track Texas Penal Code section 9.32 by omitting reference to two other applicable circumstances where the presumption of reasonableness could arise. [218] Specifically, the instruction only included a presumption of reasonableness when the actor believed that the person against whom deadly force was used was committing or attempting to commit murder, while section 9.32 also provides a presumption of reasonableness when the actor believes the other person was unlawfully and with force entering or attempting to enter the actor's vehicle, or removing or attempting to remove the actor from his vehicle. [219]

Additionally, the jury charge did not instruct on the law of multiple assailants, nor did it include language regarding the threat of deadly force by production of a weapon as discussed in Texas Penal Code section 9.04. [220] Elizondo's trial counsel likewise did not object to these omissions from the jury charge. [221]

Rather, Elizondo's trial counsel objected that the language regarding provocation should not be included. [222] He argued that even assuming there was provocation, it was not directed at Limon, and the evidence admitted at trial did not

---

[218]   *See generally* 17 RR.
[219]   TEX. PENAL CODE ANN. § 9.32(b)(1)(A)-(B).
[220]   2Supp.CR2-8.
[221]   *See generally* 17 RR.
[222]   17RR64.

support a provocation instruction.[223] The Court overruled that objection and included the following instruction in the charge:

> You are further instructed as part of the law of this case, and as a qualification of the law on self-defense, that the use of force by a defendant against another is not justified if the defendant provoked the other's use or attempted use of unlawful deadly force, unless (a) the defendant abandons the encounter, or clearly communicates to the other his intent to do so, reasonably believing he cannot safely abandon the encounter, and (b) the other person, nevertheless, continues or attempts to use unlawful force against the defendant.
>
> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jose Guadalupe Rodriguez Elizondo, immediately before the difficultly, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's, part to produce the occasion for killing the deceased, Fermin Limon, and to bring on the difficultly with the said deceased, and that such words and conduct on the defendant's part, if there were such, were reasonably calculated to, and did, provoke the difficulty, and that on such account the deceased attacked defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to attack him, and that the defendant then killed the said Fermin Limon by use of deadly force, to wit, by shooting him with a firearm, in pursuance of his original design, if you find there was such design, ***then you will find the defendant guilty of murder***.[224]

Notably, in this instruction, the jury was not told to find against Elizondo on the issue of self-defense if they found provocation; instead, they were instructed to

---

[223]    17RR64.
[224]    2Supp.CR5-6 (emphasis added).

26

find Elizondo guilty of murder.[225] Elizondo's trial counsel did not object to the language directing the jury to find Elizondo guilty.[226]

## 7. The jury finds Elizondo guilty, and sentences him to twenty-five years in prison.

The jury found Elizondo guilty of murder, rejecting his self-defense arguments. [227] The jury then heard evidence on punishment, and it assessed punishment at twenty-five years' imprisonment in the Texas Department of Criminal Justice Institutional Division, with no fine.[228]

## 8. The Court of Appeals affirms.

The court of appeals acknowledged the essentially undisputed sequence of events but dismissed Elizondo's self-defense argument with two short, conclusory paragraphs, glossing over Elizondo's arguments distinguishing the two altercations and his assertion that he abandoned the difficulty.[229] The court held that an alleged statement by Elizondo *after* he had already started to flee the difficulty and *after* the men initiated a chase to his vehicle provoked the second altercation,

---

[225] *Id.*

[226] *See generally* 17 RR. The undersigned counsel inadvertently asserted in the petition for discretionary review that trial counsel objected to this language in the jury charge. The error was based on the court of appeals' erroneous holding that an objection was made, and the undersigned counsel did not notice the error until preparing this Brief on the Merits. The undersigned counsel has filed a motion for leave to amend the petition for discretionary review to correct the error, and profusely apologizes to the Honorable Court for the oversight.

[227] 2Supp.CR9.

[228] 2Supp.CR14.

[229] *Elizondo v. State*, No. 13-12-00028-CR, 2014 WL222834, at *6 (Tex. App.—Corpus Christi Jan. 16, 2014, pet. filed) (mem. op., not designated for publication).

undermining Elizondo's self-defense justification.[230] The court, however, did not analyze the elements of provocation with respect to these statements.[231]

The court of appeals also rejected Elizondo's arguments relating to the jury charge.[232] First, the court of appeals held that the trial court properly gave a provocation instruction.[233] The court opined:

> Here, there was some evidence to show that Elizondo provoked the fight. [Rodrigo] testified that Elizondo told Junior, "Don't disrespect my woman, you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?" Junior stated that Elizondo called him a "pendejo " or "dumbass." Then, both Rigo and Junior testified that Elizondo swung, hitting Limon, Sr. These words and actions constituted "some" evidence that Elizondo provoked the first difficulty.
>
> As noted earlier, however, the provocation doctrine is limited if the defendant abandoned the difficulty. Elizondo argues he "abandoned" the encounter by running from the difficulty outside the bar to his pickup truck, nearly seventy yards away. Therefore, he contends that the provocation instruction was improper. To achieve the abandonment caveat to the provocation doctrine, though, it is "necessary that the intention to abandon the difficulty be, in some manner, communicated by the appellant so as 'to advise his adversary that his danger has passed, and make his conduct thereafter the pursuit of vengeance rather than measures to repel the original assault.'" Further, "the abandonment of the difficulty by the defendant does not arise where the difficulty was continuous, the only change being in the position of the parties during the progress of the encounter."
>
> While it is undisputed by all of the witnesses that Elizondo ran nearly seventy yards away from the first difficulty, Junior testified

---

[230]     *Id.*
[231]     *Id.*
[232]     *Id.* at *7-10.
[233]     *Id.* at *7-8.

28

that Elizondo was yelling, "Van a ver," roughly translated as "You will see," while running. Junior testified that he believed that Elizondo's words constituted a threat to the others, which made Junior scared. These words did not communicate to Junior that the danger had passed. Further, the jury was presented with Elizondo's statement to the police which provided that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports a rational inference that Elizondo was running to his truck for a weapon, not to escape the fight. Accordingly, we find that a reasonable jury could have surmised that Elizondo did not abandon the first encounter, and that the provocation instruction was therefore merited.

We conclude that the trial court did not err when it submitted the provocation instruction to the jury because there was sufficient evidence to raise this issue. Because we have found no error, no harm analysis is required. We overrule this issue.[234]

Second, the court of appeals held that while it was error for the jury charge not to include all the presumptions of reasonable force as provided in section 9.32, the error did not cause egregious harm.[235] The court explained:

Elizondo also argues that the trial court erred when it failed to include all of the presumptions of reasonable force as provided by section 9.32 of the penal code. The jury charge only provided that a presumption of reasonableness would arise if Elizondo "knew or had reason to believe that the person against [whom] deadly force was used was committing or attempting to commit murder." Elizondo argues that two additional scenarios should have been added to the charge. First, where the actor knew or had reason to believe an assailant "unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment." And second, where the actor "(B) unlawfully and with force removed, or was attempting to

---

[234]   *Id.* at *8 (internal citations omitted).
[235]   *Id.* at *8-9.

remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment."

Elizondo complains that he knew or had reason to believe that Junior unlawfully and with force pulled him out of his pickup truck, or was attempting to do so. He stated that Junior's banging on Elizondo's driver's side window yelling "Get off asshole" meant that he was entitled to those instructions.

We agree that the evidence in the record warranted the inclusion of these instructions. Accordingly, we hold that the trial court erred by omitting them. Having found error, though, we do not find any egregious harm. Because we previously concluded that a reasonable jury could have found that Elizondo was not entitled to a self-defense argument because he provoked the initial difficulty and did not abandon the encounter, see section III(B)(1) supra, these extra instructions would not have affected the outcome. We overrule this issue.[236]

Third, the court held that the trial court erred by instructing the jury that if the court found provocation, it should find Elizondo guilty of murder (instead of instructing the jury that it should reject the self-defense argument).[237] As referenced in footnote 226 of this brief and in the motion for leave to amend the petition for discretionary review filed by the undersigned counsel, the court of appeals erroneously concluded that this error was preserved by objection in the trial court. The court found the error was harmless, but nevertheless did not analyze all the *Almanza* factors:

Having found error, we turn to a harm analysis. To determine if Elizondo suffered some harm by this incorrect instruction, we

---

[236] *Id.*
[237] *Id.* at *9.

consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." Upon a thorough review of the trial record and jury charge, though, we find no harm. From voir dire to closing arguments, the jury was repeatedly instructed that it was the State's burden to prove that Elizondo committed murder. The jury charge reinforced this tenet. In light of the foregoing, we hold that the error was harmless and overrule this issue.[238]

Finally, the court rejected Elizondo's arguments relating to instructions on "threats as justifiable force" and multiple assailants, holding that under this Court's decision in *Posey v. State*,[239] Elizondo waived the right to these instructions by failing to request them.[240]

Elizondo petitioned this Court for discretionary review, raising three grounds. The first ground asked the Court to find, as a matter of law, that Elizondo sufficiently abandoned the first altercation by fleeing nearly 70 yards to his truck, which was the only reasonable place to run under the circumstances. This Court did not request briefing on that issue. Elizondo can only assume that the Court agrees with the argument in his petition for discretionary review regarding the first ground presented.

The second ground asked the Court to hold that the court of appeals should have completed a full evaluation of the elements of provocation under *Smith v.*

---

[238] *Id*. (internal citations omitted).
[239] 966 S.W.2d 57, 62 (Tex. Crim. App. 1998).
[240] *Elizondo*, 2014 WL 222834, at *10.

31

*State* with respect to the second altercation, and that Elizondo should have been acquitted upon completion of that analysis. The third ground asked the Court to review the court of appeals' analysis of the jury charge errors. This Court requested briefing on only the second and third grounds.

## SUMMARY OF THE ARGUMENT

The court of appeals failed to analyze all the elements of *Smith v. State* with respect to provocation of a second altercation, after abandonment of an initial altercation. After his wife was mistreated by a bouncer at a nightclub, Elizondo— an off-duty United States Customs officer—was involved in an initial altercation with the bouncer and several others outside the club. Elizondo was outnumbered during this initial altercation, and he feared for his life. The undisputed evidence shows that Elizondo fled the first difficulty by running nearly seventy yards to his truck and getting inside the vehicle.

Nevertheless, the bouncers chased Elizondo all the way to his truck, cursing and yelling at him to stop running, and then "banging on the windows" of the truck to force him out. Once at the truck, Elizondo was forcefully removed from it and engaged in a second altercation with the men. As part of this second altercation, the club's owner, Limon, pointed a gun at Elizondo, refused to put the weapon down after being told to do so by Elizondo, and Elizondo fired his own gun in self-defense, causing Limon's death.

Under *Smith v. State,* the court of appeals should have reviewed whether Elizondo did some act or used some words which provoked the second altercation, whether his acts or words were reasonably calculated to provoke the attack, and whether the act was done or the words were used for the purpose and with the intent that Elizondo would have a pretext for harming another.

A thorough analysis shows that Elizondo did not actually provoke the second attack by stating, "Van a ver." Those words were spoken after Elizondo attempted to flee the initial altercation, but the Punto 3 employees were already engaged in a chase. Additionally, there was nothing to show that these words were reasonably calculated to provoke the attack, or that they were spoken for the purpose and with the intent Elizondo would have a pretext for harming another. This Court should engage in the analysis, or remand to require the court of appeals to do so.

Additionally, the court of appeals affirmed on a jury charge that was replete with harmful errors. First, there was no evidence to justify a provocation instruction with respect to the second altercation.

Second, the court of appeals erroneously held that two omissions from the charge—relating to threats of deadly force and the law of multiple assailants— were waived, refusing to review the omissions for egregious harm. This holding is contrary to this Court's decisions in *Barrera v. State* and *Vega v. State* that once a

trial court charges on a defensive issue, but fails to do so correctly, this is charge error subject to review under *Almanza*. This Court should recognize these errors as reviewable and apply the egregious harm standard.

Third, the jury charge contained an incomplete instruction on the presumption of reasonableness, and an erroneous provocation instruction that decreased the State's burden of proof. The court of appeals, however, wholly failed to analyze the *Almanza* factors to determine whether Elizondo suffered the requisite degree of harm.

Analyzing the *Almanza* factors with respect to this woefully deficient jury charge shows that Elizondo suffered the requisite degree of harm from the errors and was deprived of his ability to adequately present his only defense. Accordinlgy, he should receive a new trial.

## ARGUMENT

### I. The court of appeals should have analyzed all the elements of *Smith v. State*.

Elizondo specifically argued below that the first and second altercations should be distinguished based on the timing of the events, that the first altercation was abandoned when he ran to nearly 70 yards and got inside his vehicle, and that there was no evidence he said or did anything sufficient to provoke the second attack as a pretext to kill Limon. Rejecting Elizondo's arguments in one short paragraph, the court below held:

Elizondo argues, however, that even assuming he provoked the initial difficulty, he abandoned this first encounter near the bar by running to his pickup truck. This abandonment would thus make him eligible for the self-defense affirmative defense. However, we conclude that a reasonable jury could have found otherwise. Junior testified that when Elizondo left the first difficulty and ran to his pickup truck, he was yelling, "Van a ver," roughly translated as "You will see." Junior was frightened by that statement and believed it constituted a threat to him and his co-workers. Further, the jury had Elizondo's police statement wherein he admitted that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports the jury's implied finding that Elizondo was running to his truck for his firearm, not to abandon or discontinue the fight.[241]

The court of appeals' analysis glossed over the distinction between the two altercations and failed to conduct an analysis under this Court's decision in *Smith v. State*.[242] Analyzing the facts of this case under that framework, Elizondo should have been acquitted. This Court should perform the analysis the court of appeals improperly refused to perform.

In *Smith*, this Court addressed the doctrine of "provoking the difficulty," which it initially defined as follows:

> Provoking the difficulty, as the doctrine of provocation is commonly referred to in our jurisprudence, is a concept in criminal law which acts as a limitation or total bar on a defendant's right to self-defense. The phrase "provoking the difficulty" is a legal term of art, and more accurately translates in modern usage to "provoked the attack." The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for

---

[241] *Elizondo*, 2014 WL 222834, at *6 (citations omitted).
[242] 965 S.W.2d 509, 512 (Tex. Crim. App. 1998).

killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.[243]

The Court specifically addressed the elements of provocation, explaining that for the factual issue to be raised, the State must show:

  (1)    that the defendant did some act or used some words which provoked the attack on him,

  (2)    that such act or words were reasonably calculated to provoke the attack, and

  (3)    that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.[244]

Applying this analytical construct to the facts, the State must have shown that Elizondo performed some act or used words that actually provoked the second attack, the words or acts were the type that would ordinarily provoke an attack, and Elizondo intended to provoke the second attack to have a pretext for killing Limon.[245]

## A. There was no evidence that Elizondo performed some act or used words that actually provoked the second attack.

The evidence in this case showed that Elizondo fled from the initial altercation and ran to his truck—the only reasonable location to flee given that Elizondo's wife was still at the club—only to be pursued by multiple assailants

---

[243]    965 S.W.2d at 512.

[244]    *Id.*

[245]    *See id.*

over a long distance in pursuit of vengeance. The evidence showed that the words,

"Van a ver," could not have actually provoked the second altercation.

As this Court has held, "[a] defendant may have a desire that the victim will

attack him, or he may seek the victim with the intent to provoke a difficulty, but

the defendant must go further and do or say something which *actually* provokes the

attack before he will lose his right to self-defense."[246] And as early as 1918, this

Court in *Trevino v. State* held that the acts alleged to have provoked an altercation

must occur *prior to* and *actually cause* the altercation.[247] There, the Court

explained:

> Provoking a difficulty is always in direct conflict with justifiable homicide, and is not permissible unless the accused by his acts, conduct, or words occasioned or produced the difficulty. When perfect self-defense is relied upon by the accused, there should be, as a prerequisite to its impairment, evidence that the accused produced the occasion for the killing as an excuse for the homicide. His acts, conduct, or words must precede such condition, and must be evidenced by the testimony. This is the law under correct legal views and under the well-considered jurisprudence of this state. These facts must precede and lead to the homicide. If the difficulty does not so begin, provoking the difficulty is not a part of the case, and a charge limiting the right of perfect self-defense would constitute error, and of such a nature as to constitute its giving necessarily fatal to the conviction.

> ….

> We are of opinion that this testimony does not raise the issue of provoking the difficulty. Usually the language that some of the

---

[246]     *Smith,* 965 S.W.2d at 512 (emphasis added).
[247]     *Trevino v. State*, 83 Tex. Crim. 562, 565, 204 S.W.2d 996, 997-99 (1918) (op. on reh'g).

witnesses impute to defendant, that deceased was the "son of a harlot," would be considered a provocation, and had it been used at the beginning of this difficulty and the inducing cause, it would have been treated as a cause upon which provoking a difficulty could be grounded. But, as before stated, provoking a difficulty must precede and be the occasion of bringing about the difficulty. [248]

As an additional example, in *Reeves v. State*, the First Court of Appeals held that threats made after an altercation was already in progress could not have provoked the attack.[249] Specifically, the court held:

> The State argues that a rational jury could have found beyond a reasonable doubt that Reeves did or said something that caused Jackson to attack him and that those words or acts were reasonably capable of causing an attack based upon both direct and circumstantial evidence. Although Adams testified that Reeves threatened to kill Jackson, Reeves did not make those threats until after the fighting had started. Similarly, Reeves testified that when he and Jackson were wrestling in the front yard, Jackson pinned him to the ground at one point, and he bit Jackson on the face in order to get free. Based upon this uncontroverted testimony, both Reeves's threat and the bite occurred after he and Jackson were physically fighting in the front yard. Such threats and conduct could not have provoked a fight that was already in progress.[250]

Thus, actual provocation would be a necessary element of any claim by the State that Elizondo provoked the second altercation. In other words, the State would have to show that Elizondo's words, allegedly spoken while Elizondo was

---

[248]    *Id.*

[249]    *Reeves v. State*, No. 01-10-00395-CR, 2012 WL 5544770, at *4 (Tex. App.—Houston [1st Dist.] Nov. 15, 2012) (mem. op., not designated for publication), *aff'd*, 420 S.W.3d 812 (Tex. Crim. App. 2013); (15 RR 235 (stating that upon hearing those words, Junior continued chasing Elizondo, but slowed down)).

[250]    *Id.*

abandoning the first altercation, actually provoked the second altercation.[251] Given the sequence of events, the State failed that burden.

It was undisputed that Elizondo ran through the parking lot, around the fence, and to his vehicle, and Bryan, Rodrigo, and Junior chased Elizondo the entire distance, which was approximately 67 yards.[252] During the chase, Rodrigo was yelling at Elizondo to "stop asshole."[253]

The only testimony regarding the initial reason for the chase came from Junior, who claimed that he followed Elizondo to his truck to make sure he left safely, which is totally consistent with Elizondo's abandonment of the first altercation.[254] And, Elizondo expressly testified that he ran to his truck to get away from his attackers and got inside the vehicle.[255] Yet upon arriving at the truck and discovering Elizondo inside it, Junior did not then just make sure that Elizondo left—he admitted to pounding on Elizondo's vehicle with his hands, and other witnesses testified that Junior was also yelling, "Get off, asshole."[256] In fact, Rodrigo testified that Junior was trying to get Elizondo to come out of his truck because Elizondo was already inside.[257]

---

[251]    *See Mendoza v. State*, 349 S.W.3d 273, 280-81 (Tex. App.—Dallas 2011, pet. ref'd).
[252]    11 RR 95; 12 RR 178, 180; 13 RR 15, 26, 66; 14 RR 102-03,126, 235; 15 RR 133-34; 15 RR 233; 16 RR 113, 197; 21 RR DX 21.
[253]    14 RR 102, 126.
[254]    16 RR 9-10, 25.
[255]    16 RR 113-14; 21 RR DX 21.
[256]    13 RR 149, 179; 14 RR 104, 105; 15 RR 42; 16 RR 19.
[257]    15 RR 80.

39

Junior testified that while Elizondo was running away, Elizondo said the words, "Van a ver" (in English, "You're going to see"), claiming that he took those words as a threat. But Junior expressly testified that he had already started the pursuit by that time.[258] Thus, those words did not actually provoke the pursuit of Elizondo by Rodrigo, Bryan, and Junior, which was already underway. Accordingly, the State's evidence did not show that any words by Elizondo actually provoked the second attack.

**B.     There was no evidence that the words "Van a ver" were reasonably calculated to provoke an attack or that the words were used for the purpose and with intent to provide a pretext.**

There simply was no showing that the words, "Van a ver," were reasonably calculated to provoke an attack or used for the purpose and with the intent to provide Elizondo with a pretext for inflicting harm upon Junior or Limon.[259] "An act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack. Some provoking acts or words can by their own nature be legally sufficient to support a jury finding."[260]

---

[258]     15 RR 235.
[259]     *Smith*, 965 S.W.2d at 512.
[260]     *Smith*, 965 S.W.2d at 517

40

For example, this Court has held that calling a deceased a "son of a bitch" could reasonably be calculated to cause an attack.[261] Express threats to kill the complainant,[262] calling the complainant a derogatory name while grabbing the complainant's arm with force,[263] approaching the complainant while pointing a gun and yelling obscenities,[264] have all been held to be reasonably capable of causing an attack.

In contrast, this Court in *Morrison v. State* held that where words on their face do not appear sufficient to provoke a difficulty, the State must introduce evidence of the colloquial meaning.[265] For example, in that case, the Court interpreted a request to discuss a matter "man for man," and whether those words were reasonably capable of causing a difficulty. The Court held that "[w]hile it is true that words alone may provoke a difficulty, they must clearly be designed to do so. . . . Without any testimony in the record as to the meaning commonly given

---

[261] *Bateson v. State*, 46 Tex. Crim. 34, 46, 80 S.W. 88, 93 (1904).

[262] *Malone v. State*, No. 06-11-00013-CR, 2011 WL 5221264, at *8 (Tex. App.—Texarkana Nov. 3, 2011, no pet.) (mem. op., not designated for publication).

[263] *Osborne v. State*, No. 02-11-00010-CR, 2011 WL 5903651, at *3 (Tex. App.—Fort Worth Nov. 23, 2011, no pet.) (mem. op., not designated for publication) ("Further, the trial court could have rationally found that appellant's words and acts (approaching Aaron, calling her a 'bitch' and yelling 'more things,' and grabbing her arm with 'force') were reasonably calculated to provoke Aaron's attack."); *see, e.g., Guerra v. State,* No. 13-99-036-CR, 2000 WL 34251905, at *2 (Tex. App.—Corpus Christi Aug. 17, 2000, no pet.) (not designated for publication) ("Calling someone a bad name, threatening that person, and throwing rocks at the person's vehicle are acts which are reasonably capable of causing an attack, or have a reasonable tendency to cause an attack.").

[264] *Clark v. State*, No. 04-13-00330-CR, 2014 WL 3843946, at *7 (Tex. App.—San Antonio Aug. 6, 2014, pet. ref'd) (mem. op., not designated for publication).

[265] *Morrison v. State*, 158 Tex. Crim. 424, 425, 256 S.W.2d 410, 411 (1953).

such expression in the community involved in the prosecution, we are powerless to read into such expression something not apparent on its face."[266]

There was simply no evidence to support a finding that the words, "Van a ver," were of the type that were reasonably capable of causing an attack or had a reasonable tendency to cause an attack. In fact, Junior's own explanation for the pursuit belies any reliance on the words, "Van a ver," as the provocation for the second altercation, as he testified he followed merely to make sure that Elizondo was going to leave *and* that Elizondo's words were spoken after the pursuit was already underway. Yet, once he discovered Elizondo already inside the vehicle, he banged on the window to get him out of the truck.

Additionally, there was *nothing* presented that showed that Elizondo intended to do anything other than escape the attack by running to his truck. As this Court explained in *Smith,*

> [t]he third element of the doctrine requires that the act was done, or the words were used, for the purpose and with the intent that the defendant would have a pretext for killing the victim. Even though a person does an act, even a wrongful act, which does indeed provoke an attack by another, if he had no intent that the act would have such an effect as part of a larger plan of doing the victim harm, he does not lose his right of self-defense.[267]

---

[266]   *Id.*
[267]   *Smith*, 965 S.W.2d at 518.

There is simply nothing to support a finding that Elizondo intended his words or actions to provoke Junior into a further fight or Limon into pointing a weapon at him as a pretext for killing him.

The court of appeals relied on a statement given to police where Elizondo said that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun."[268] The fact that Elizondo ran towards his truck where his gun was located does not imply that he intended to continue the altercation at the truck or that he intended to use the altercation as a pretext to kill Limon—in fact, the same statement shows that Elizondo perceived that the men were "attacking" him and he "just thought [he] needed to get away from them before they take him to the ground."[269] The statement relied upon by the court of appeals can only support its decision when taken completely out of context.

For all the foregoing reasons, the evidence was legally insufficient to support a finding that Elizondo provoked the second altercation. The evidence showed that Elizondo was entitled to the presumption of reasonableness in Texas Penal Code 9.32(b)(1)(A) and (B), given that Junior indisputably either (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, Elizondo's occupied vehicle; or (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, Elizondo from his vehicle.

---

[268] *Elizondo*, 2014 WL 222834, at *6; *see* 21RRDX21.
[269] 21RRDX21.

43

Under the law of multiple assailants, the permissive use of deadly force by Jose against Junior justified his use of deadly force against Limon.[270] The court of appeals did not complete its legal sufficiency analysis because it stopped with provocation.[271]

This Court should conduct the *Smith* analysis, complete the remaining analysis of legal sufficiency of the evidence, and render a judgment of acquittal.[272] At the very least, this Court should remand to the court of appeals for further analysis under *Smith*.[273]

## II. The court of appeals affirmed on a jury charge that was grossly incorrect by ignoring and then misapplying this Court's precedent.

The court of appeals' opinion demonstrates an inconsistent application of this Court's precedent that could lead to erroneous future decisions in an area of law that is already confusing, at best. Elizondo raised five different charge errors, which the court of appeals erroneously rejected without applying the proper preservation and harm standards. Ultimately, Elizondo's conviction was affirmed on a jury charge that was an "impenetrable forest of legal 'argle-bargle.'"[274]

---

[270] *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985).
[271] *Elizondo*, 2014 WL 222834, at *6.
[272] TEX. R. APP. P. 78.1(c) (providing Court can " reverse the court's judgment in whole or in part and render the judgment that the lower court should have rendered).
[273] TEX. R. APP. P. 78.1(d).
[274] *Reeves*, 420 S.W.3d at 817.

**A.** **The court of appeals erroneously affirmed the trial court's submission of a provocation instruction.**

A provocation instruction should be submitted to the jury only when "there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt."[275] As demonstrated in Part I, there was simply no evidence of provocation. The evidence showed that, under the law of provocation, Elizondo sufficiently abandoned the first encounter by running away to and getting inside his truck.[276] The evidence in this case did not show a mere change of position of the parties during the progress of the encounter. Rather, it showed Elizondo fleeing from the initial altercation and running to his truck, only to be pursued by multiple assailants over a long distance in pursuit of vengence.[277] And there was no evidence that Elizondo provoked the second altercation, which was initiated by Junior. For all the reasons set forth in Part I of this brief, the Court should find that there was no evidence of provocation of the second altercation to support submission of that instruction to the jury.

Where the defendant objects to the inclusion of a provocation instruction, and there is no evidence to support the submission, the reviewing court must

---

[275]    *Smith*, 965 S.W.2d at 514.
[276]    12 RR 178, 180; 13 RR 15, 26, 66; 14 RR 126, 235; 15 RR 133-34; 15 RR 233; 16 RR 113, 197; 21 RR DX 21.
[277]    11 RR 95; 12 RR 178, 180; 13 RR 15, 26, 66; 14 RR 102-03,126, 235; 15 RR 133-34; 15 RR 233; 16 RR 113, 197; 21 RR DX 21.

reverse if the erroneous submission of the instruction caused some actual harm.[278] When considering harm, the issue for the court is "whether, in the absence of the provocation instruction, there would have been any chance that the jury would have found that [appellant] acted in self defense."[279] Because the court of appeals held there was no error in the charge by submitting a provocation instruction, it did not reach the question of harm.[280] This Court should conduct the analysis or, at the very least, remand to the court of appeals for consideration of the harm. Certainly, as more fully demonstrated below, Elizondo suffered at least some harm from the inclusion of this erroneous charge.

B. **The court of appeals erroneously refused to review two omissions from the charge, in conflict with this Court's prior decisions.**

Elizondo argued below that once the trial court undertook to charge the jury on the law of self-defense, it had the obligation to provide correct and complete instructions—the self-defense instructions should have included instructions on threats as justifiable force and on the law of multiple assailants.

---

[278]    *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *Mendoza*, 349 S.W.3d at 281-84.

[279]    *Mendoza*, 349 S.W.3d at 281 (quoting *Flores v. State*, No. 06-05-00023-CR, 2008 WL 41388, at *4 (Tex. App.—Texarkana Jan. 3, 2008, pet. ref'd) (mem. op., not designated for publication)).

[280]    *Elizondo*, 2014 WL 222834, at *7-8.

46

The jury charge did not provide an instruction on section 9.04, regarding a threat of deadly force by production of a weapon.[281] This was certainly raised by the evidence. Elizondo stated he intended to grab his gun and his credentials and thought that if he displayed them, the men might stop.[282]

Additionally, the jury charge omitted any reference to the law of multiple assailants, instead instructing the jury with reference only to Limon's conduct. This Court, however, has held that when there are multiple assailants, a jury charge focusing on only one of those assailants is too restrictive.[283] There was certainly evidence in the record that multiple attackers were pursuing Elizondo.[284] It was error for the trial court to limit its instructions to Elizondo's beliefs as to the "person against [whom] deadly force was used."[285]

Elizondo argued below that *Barrera v. State* required treating the omission of the multiple assailants charge as "error" that the court could properly review under *Almanza*. In *Barrera*, this Court held that when a trial court undertakes to instruct a jury on a defense raised by the evidence, that defense becomes the law applicable to the case, and the trial court has a duty to state the law correctly.[286]

---

[281] *See* TEX. PENAL CODE ANN. § 9.04.

[282] 16RR200-201; *see Reynolds v. State,* 371 S.W.3d 511, 522 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

[283] *Frank*, 688 S.W.2d at 868; *Lerma v. State,* 807 S.W.2d 599, 601 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd).

[284] 17RR19, 21.

[285] 2Supp.CR3.

[286] *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998).

The Court held that where a self-defense instruction contains an error to which counsel did not object—in that case a complete omission of an application paragraph—the error is subject to review for egregious harm.[287]

This Court later clarified that it does not matter if the defensive instruction was initially requested by the defendant or sua sponte included by the judge—the judge bears sole responsibility for errors in the charge:

> However, if the trial judge does charge on a defensive issue *(regardless of whether he does so sua sponte or upon a party's request),* but fails to do so correctly, this is charge error subject to review under *Almanza*. If there was an objection, reversal is required if the accused suffered "some harm" from the error. If no proper objection was made at trial, a reversal is required only if the error caused "egregious harm."[288]

The court of appeals, however, refused to recognize this precedent and held that both the "threats as justifiable force" and "multiple assailants" issues were waived by defense counsel's failure to request the instructions.[289] The court erroneously refused to review these errors or apply a harm analysis. This Court should correct that error, determine the charge was erroneous, and apply the appropriate harm standard. At the very least, the Court should remand to the court of appeals to conduct the harm analysis.

---

[287] *Id.* at 417.
[288] *Vega v. State,* 394 S.W.3d 514, 518-19 (Tex. Crim. App. 2013) (emphasis added).
[289] *Elizondo*, 2014 WL 222834, at *10.

## C. The court of appeals erroneously failed to properly apply the appropriate harm analysis to the other charge errors.

Elizondo further pointed out two other errors in the jury charge, which the court of appeals held were reviewable but then failed to properly analyze under *Almanza.*

First, the presumption of reasonableness instruction was incomplete. The jury was instructed that a presumption of reasonableness would arise if the actor "knew or had reason to believe that the person against [whom] deadly force was used was committing or attempting to commit murder."[290] However, Texas Penal Code section 9.32(b) provides that the presumption arises in two other situations raised by the evidence in this case, where the actor knew or had reason to believe an assailant "(A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;" and "(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment."[291] Here, the evidence showed that Elizondo knew or had reason to believe that Junior either unlawfully, and with force, entered Elizondo's vehicle or removed him from the vehicle, or

---

[290]    2Supp.CR3.

[291]    TEX. PENAL CODE ANN. § 9.32 (b)(1)(A)-(B).

49

was attempting to do so.[292] Defense counsel did not object to this charge, and while the court of appeals agreed that the evidence "warranted the inclusion of these instructions," it nevertheless found that the error was not egregiously harmful.[293]

Second, Elizondo argued that the provocation instruction changed the State's burden of proof by erroneously telling the jury that if it found provocation, it must find Elizondo guilty of murder.[294] The jury received this 169-word, unintelligible instruction:

> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jose Guadalupe Rodriguez Elizondo, immediately before the difficultly, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's, part to produce the occasion for killing the deceased, Fermin Limon, and to bring on the difficultly with the said deceased, and that such words and conduct on the defendant's part, if there were such, were reasonably calculated to, and did, provoke the difficulty, and that on such account the deceased attacked defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to attack him, and that the defendant then killed the said Fermin Limon by use of deadly force, to wit, by shooting him with a firearm, in pursuance of his original design, if you find there was such design, then *you will find the defendant guilty of murder*.[295]

The jury should not have been instructed that if it found provocation, it should find Elizondo guilty—rejection of self-defense does not require a finding of all the

---

[292]    12RR178, 180; 13RR15, 26, 66; 14RR126, 235; 15RR133-134; 15RR233; 16RR113, 197; 21RRDX21.

[293]    *Elizondo,* 2014 WL 222834, at *9.

[294]    2Supp.CR6.

[295]    2Supp.CR5-6 (emphasis added).

elements of murder. In fact, the jury was required to find all the elements of murder *and* reject self-defense in order to convict.[296] Defense counsel did not object to this error, and the court of appeals erroneously held the error was preserved, but it ultimately held there was no harm.[297]

In addressing these two charge errors, while paying lip service to the applicable standard of review, the court of appeals did not engage in any analysis at all.[298] With respect to the presumptions of reasonableness, the court of appeals held that because the jury "could have found that Elizondo was not entitled to a self-defense argument because he provoked the initial difficulty and did not abandon the encounter,… these extra instructions would not have affected the outcome."[299] But just because the jury could have believed the State's version of the evidence does not mean that it was not harmful to submit an incomplete version of Elizondo's defense.[300]

With respect to the erroneous provocation instruction, the court of appeals held that "from voir dire to closing arguments, the jury was repeatedly instructed that it was the State's burden to prove that Elizondo committed murder."[301] Those "repeated" instructions were completely undermined by the instruction that if it

---

[296]     *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).
[297]     *Elizondo,* 2014 WL 222834, at *9; *see supra* n.226.
[298]     *Id*.
[299]     *Id.*
[300]     *Cornet v. State*, 417 S.W.3d 446, 453 (Tex. Crim. App. 2013) ("We agree with appellant that a review for sufficiency of the evidence cannot substitute for a harm analysis.").
[301]     *Elizondo,* 2014 WL 222834, at *9.

rejected provocation, the jury must find Elizondo guilty of murder, yet the court of appeals did not address that argument.

### D. The jury charge was a garbled mess, and a review of the complete charge and application of the proper harm analyses requires reversal.

Considering the entire jury charge and all the harm factors, it becomes clear that Elizondo suffered the requisite degree of harm from the errors identified above. As this Court recently explained,

> The trial judge must "distinctly set[ ] forth the law applicable to the case" in the jury charge. "It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion." While generally, "in the absence of evidence to the contrary, we will assume that the jury followed its written instructions," this presupposes that the instructions are understandable. Because these instructions were not, "this is not a case in which the reviewing court should apply the usual presumption that the jury understood and applied the court's charge in the way it was written."[302]

When the jury charge contains numerous errors, incomprehensible wording, and essentially robs the defendant of his only defense, the Court should be extraordinarily careful to analyze the harm, recalling that neither party has a burden on this issue—the burden of properly analyzing harm falls squarely on this Court.[303]

---

[302]    *Reeves*, 420 S.W.3d at 819.
[303]    *Id.* at 816, 819.

52

Here, as in *Reeves*, the jury charge contained numerous errors and was incomplete.[304] Additionally, the state of the evidence mandates a finding of the requisite degree of harm. With respect to provocation and the presumption of reasonableness, the evidence was undisputed that Junior and two others pursued Elizondo to his vehicle, and Elizondo testified that Junior pulled him out of the vehicle.[305] All the witnesses testified that, at the very least, Junior was beating on Elizondo's car and trying to force him to come out.[306] But the jury was never instructed that, if it believed those facts, a presumption of reasonableness could arise.[307] Instead, in order to raise the presumption, they were instructed that they

---

[304]    The charge contained numerous confusing "converse" instructions, which tell the jury that "if the state met its burden, the juries should find against the defendants on the issue of self-defense," and which have been criticized by the Texas Pattern Jury Charge committee on Criminal Defenses:

> The Dallas court of appeals in 1999 appeared sympathetic to a defendant's argument that a converse instruction of the second type is an 'anachronism in Texas law' that violates the spirit of the prohibition against comment on the evidence. Nevertheless, it held that it was bound to precedent establishing that the giving of such a converse instruction is not a basis for reversing a conviction. *Aldana v. State*, No. 05-98-00135-CR, 1999 WL 357355, at *6-7 (Tex. App.— Dallas June 4, 1999, pet. ref'd) (not designated for publication) (relying on Powers v. State, 396 S.W.2d 389, 391-92 (Tex. Crim. App. 1965)).

> The Committee concluded that if jury instructions on self-defense are properly crafted, so-called converse instructions are neither necessary nor desirable. Thus the instruction at section B14.4 below does not include them.

Tex. Pattern Jury Charges, *Criminal Defenses,* § B14.2.9 (2013).

[305]    12RR180; 13RR15, 26, 66; 14RR126, 235; 15RR133-134, 233; 16RR113, 197, 201-203; 21RRDX21.

[306]    13RR149, 179; 14RR104-105; 15RR42, 80, 237; 16RR29.

[307]    2Supp.CR.3.

had to find that Elizondo knew or had reason to believe that Limon was committing or attempting to commit "murder."[308]

This is not a case where all the witnesses but the defendant testified in accordance with the State's theory, as in this Court's recent decision in *Villarreal v. State.*[309] Here, the self-defense justification was more than plausible—it was supported by numerous witnesses, including testimony from Elizondo, Juan, Maria, and Agent Balli.[310] Nor is the evidence "overwhelming" that Elizondo was the aggressor with respect to the second altercation, and Limon was clearly armed.[311]

Compounding this problem was the lack of a multiple assailants instruction, which would have allowed the jury to consider Junior's conduct, as well as the other two assailants.[312] Instead, all of the language in the charge referred to Limon's conduct alone.[313] Under these circumstances, the jury charge failed to adequately protect Elizondo's right to argue self-defense.[314]

Second, any evidence of guilt was not so overwhelming that the jury charge errors necessarily caused no harm to Elizondo.[315] But nevertheless, the jury was

---

308   *Id.*
309   No. PD-0332-13, 2015 WL 458146, at *5 (Tex. Crim. App. Feb. 4, 2015).
310   *See supra* Parts 1C, 2-5 and footnotes referenced therein.
311   *Compare Villarreal,* 2015 WL 458146, at *5-6.
312   2Supp.CR.3.
313   *Id.*
314   *See Brown v. State*, 651 S.W.2d 782, 784 (Tex. Crim. App. 1983).
315   *Mendoza*, 349 S.W.3d at 282.

not only instructed to disregard Elizondo's self-defense if it found provocation, it was instructed to *find Elizondo guilty of murder.*[316] In other words, the jury charge implied not only that there was some evidence to support every element of provocation, but that there was some evidence to support every element of *murder.*

Furthermore, self-defense was the focus of the entire case.[317] Specifically, Elizondo's sole defense centered on the following: (1) he abandoned the difficulty by running to his truck;[318] (2) the club's bouncers chased Elizondo to his truck yelling obscenities with the intent to continue an attack on Elizondo;[319] (3) Junior then banged on Elizondo's window to get him out of the truck;[320] (4) Elizondo was pulled out of his truck (or an attempt was made to do so), and then Limon pointed a gun at him.[321] For example, provoking the difficulty was not a theory that was downplayed or ignored by the State—provocation was the State's central argument. Specifically, the State argued during closing:

> This moment in time is pivotal, because he runs from what he says are five or six guys beating on him. That's what he told Deputy Hector Garcia. This moment is pivotal, because this is where he said—or Trooper Champion said that he just got kicked in the head. He further says that at some point in time, he books it to his car, to his truck, and on the way, he is getting hit on the head (knocking).
>
> . . . .

---

[316]   *Cf. id.*
[317]   *See* 17RR82.
[318]   17RR89.
[319]   17RR90-92.
[320]   17RR95-96.
[321]   17RR98.

55

Somewhere along the way, while he's running, he gets hit on the head. In his statement he says, at least twice. He needs you to believe that he's being beaten (indicating).

. . . .

He gets to his truck, first thing he does is pull out a weapon. Now, his testimony is that he got into his truck and closed the door. Far different from what is in his statement. He grabs the gun—and he decides to grab that gun—and at that point in time when he grabs that gun, another escalation. Things just got deadly, and all bets are off. Everybody's life now is in danger.[322]

Thus, the State did not distinguish between the two altercations, but was allowed to argue that the first altercation was the provocation that mattered. The self-defense instructions took up a significant part of the jury charge.[323] Furthermore, the state of the evidence shows harm, given that Elizondo admitted to shooting Limon.[324]

## CONCLUSION AND PRAYER

For all the foregoing reasons, this Court should reverse the judgment of the lower courts and render a judgment of acquittal or, alternatively, reverse and remand for further proceedings below.

---

[322] 17RR112-114.
[323] *See* 2Supp.CR5-6; *Mendoza*, 349 S.W.3d at 283.
[324] *Mendoza*, 349 S.W.3d at 283.

Respectfully submitted,


*/s/ Brandy Wingate Voss*
Brandy Wingate Voss
State Bar No. 24037046
SMITH LAW GROUP, P.C.
820 E. Hackberry Ave.
McAllen, TX 78501
(956) 683-6330
(956) 225-0406 (fax)
brandy@appealsplus.com

*Counsel for Appellant*
*Jose Guadalupe Rodriguez Elizondo*

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4(E)

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), because it contains 13,448 words, excluding the parts exempted by Rule 9.4.

/s/ Brandy Wingate Voss
Brandy Wingate Voss

# CERTIFICATE OF SERVICE

On March 13, 2015, in compliance with Texas Rule of Appellate Procedure 9.5, I served a copy of this document upon all other parties to the trial court's judgment and the respondent by first-class United States mail, return receipt requested, properly posted and deliverable as follows:

Ted Hake
Michael Morris
*Assistant District Attorney*
Appeals Section
Office of Criminal District Attorney
Hidalgo County, Texas
100 N. Closner, Rm 303
Edinburg, Texas 78539
Fax: (956) 380-0407
Email: ted.hake@da.co.hidalgo.tx.us
Email: michael.morris@da.co.hidalgo.tx.us


Lisa C. McMinn
*State Prosecuting Attorney*
Office of State Prosecuting Attorney of Texas
P. O. Box 13046
Austin, Texas 78711-3046
Fax: (512) 463-5724

/s/ Brandy Wingate Voss
Brandy Wingate Voss